**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**____ DIVISION**

Jane Doe (H.E.W.), an individual
*Plaintiff*

v.

ARBORETUM HOSPITALITY, INC.;
RADISSON HOSPITALITY, INC. d/b/a
COUNTRY INN AND SUITES; AMIN
DEVELOPMENT CORPORATION; OM
NAMA MAHA LAXMI, LLC;
CHAMPION REGIONAL
DEVELOPMENT, LLC; BRE/LQ TX
PROPERTIES d/b/a BAYMONT;
RADIENT PROPERTES, L.L.C. d/b/a
DAYS INN
*Defendants*

CIVIL ACTION NO: _____

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (H.E.W.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

### SUMMARY

1. Jane Doe (H.E.W.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (H.E.W.), with minimal risk of detection or interruption.

8.      Defendants continued supporting traffickers, including Jane Doe (H.E.W.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at their hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

---

[2] 18 U.S.C. §1591(e)(3).

## PARTIES

9.      Jane Doe (H.E.W.) is a natural person who is a victim of sex trafficking within the meaning of 18 U.S.C. §§1591 and 1595(a).

**Country Inn & Suites**

10.     Defendant Arboretum Hospitality, Inc., hereinafter referred to as "Country Inn Franchisee Defendants" is a for-profit Texas limited liability company with its principal place of business at 134 Lakota Pass, Austin, Texas 78738-6563. It can be served by service on its registered agent Rajesh B. Patel located at 7400 IH 35 North, Austin, Texas 78752.

11.     At all relevant times, Arboretum Hospitality, Inc., was the property owner of the Country Inn & Suites hotel located at 7400 North Interstate 35 Frontage Road, Austin, Texas 78752, and entered into a franchising agreement to operate the property as an Arboretum Hospitality, Inc., branded property.

12.     Radisson Hospitality, Inc. d/b/a Country Inn & Suites by Radisson hereinafter referred to as "Country Inn Brand Defendants" is a for-profit Texas corporation incorporated in Texas and with its principal place of business in Harris County, Texas. At all relevant times, Radisson Hospitality, Inc. owned, operated, and controlled the Country Inn & Suites by Radisson located at 7400 N. Interstate 35 Frontage Road, Austin, Texas. Radisson Hospitality, Inc. may be served with process by serving its registered agent, Shree Madan at 9920 Westpark Drive, Suite 101, Houston, Texas 77063.

**Americas Best Value Inn**

13.     Defendant Amin Development Corporation, hereinafter referred to as "Americas Best" is a for-profit Texas corporation with its principal place of business at 1808 Harvest Dance

Dr. in Leander Texas, 78641. It can be served by service on its registered agent, Niketa J. Amin located at 1808 Harvest Dance Dr., Leander, Texas 78641.

14.    At all relevant times, Amin Development Corporation was the property owner of the Americas Best Value Inn located at 909 E. Koenig Lane, Austin, Texas 78751.

**Baymont Inn and Suites**

15.    Defendant Om Nama Maha Laxmi, LLC is a Texas limited liability company with its principal place of business at 1306 Pasa Tiempo, Leander, Texas 78641. It can be served by service on its registered agent, Thomas J. Irons located at 1790 Preston Rs. Ste 650, Dallas, Texas 75252.

16.    Defendant Champion Regional Development, LLC. is a Texas Limited Liability Corporation who can be served by service on its registered agent Champak B. Patel located at 3048 N. Grand Blvd., Oklahoma City, Oklahoma 73107.

17.    Defendant BRE/LQ TX Properties is a Texas Corporation with its principal place of business at 545 E. John Carpenter FWY. Ste 1400, Irving Texas 75062 who can be served by service on its registered agent Cogency Global, Inc. located at 1601 Elm St. Ste 4360, Dallas, Texas 75201.

18.    At all relevant times, Defendants Om Nama Maha Laxmi, LLC, Champion Regional Development, LLC., and BRE/LQ TX Properties, hereinafter collectively referred to as "Baymont" were the owners of the Baymont Inn and Suites located at 909 E. Koenig Lane, Austin, Texas 78751.

**Days Inn.**

19.    Defendant Radiant Properties, LLC., hereinafter referred to as "Days Inn" is a Colorado limited liability company with its principal place of business at PO Box 2332 Parker,

4

Colorado, 80134.  It can be served by service on its registered agent Austen Harvey located at 17 Highland Lane, Canyon, Texas 79015.

20.     At all relevant times, Defendant Radiant Properties, L.L.C was the owner of the Days Inn located at 820 East Anderson Lane, Austin, Texas 78752.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Western District of Texas, and all Defendants are residents of Texas.

23.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas.

24.     A significant part of the trafficking alleged happened in this District.

## FACTS

**I.     Jane Doe (H.E.W.) Was a Victim of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed, and Controlled by Defendants.**

25.     Jane Doe (H.E.W.) met her trafficker at a friend's party. The trafficker got her hooked on drugs and told her she was going to model to make money but instead forced her into trafficking. The trafficker posted Jane Doe (H.E.W.) online and used drugs, coercion and violence to cause her to perform sex services for his financial benefit.  Jane Doe (H.E.W.) was trafficked until she was rescued by police in 2014.

26.     Jane Doe (H.E.W.)'s traffickers moved her between hotels in the Austin area, coercing her to perform commercial sex services for their benefit.

27.     Jane Doe (H.E.W.)'s sexual exploitation occurred at hotels owned, operated, managed, and controlled by Defendants, and each of the Defendants participated in a venture that facilitated this trafficking.

28.     While in these hotels, Jane Doe (H.E.W.) would be forced to see as many as 15 "johns" per day.

29.     Jane Doe (H.E.W.)'s trafficking had profound effects on her, consistent with well-recognized "red flags" of trafficking in the hospitality industry, that were obvious and apparent to the staff and management of Defendants' hotels, including effects on her appearance, demeanor, movements throughout the hotel, and interactions with others. This included visible signs of the violence repeatedly inflicted on Jane Doe (H.E.W.), effects from coerced use of drugs, apparent signs of fear, and other signs that provided notice that she was being continually subjected to violence, coercion, control, and exploitation.

**II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem**

30.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what each of the Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (H.E.W.).

31.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[4] In 2014, 92% of calls received by the National

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016),

Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of commercial exploitation of children.[6]

32.     The New York Attorney General has recognized that traffickers rely on the hospitality industry for moving, controlling, and delivering victims of commercial sex or forced labor and that, as a result, hotels have an obligation to report, respond to, and prevent human trafficking.[7]

33.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

34.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

---

http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[7] https://wutv29.com/news/local/nys-ag-reminds-hotels-of-obligation-to-help-human-trafficking-victims-as-travel-increases

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

7

35.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

---

[9] *See Id.*

36.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

37.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[10]

38.     In 2013, the State of New York implemented a Human Trafficking Intervention Court because "there was a recognition that most of the people engaged in commercial sex work are not involved voluntarily."[11]

39.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

40.     Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[12] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

_____

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[11] https://www.wbfo.org/local/2018-08-09/western-new-york-no-stranger-to-human-trafficking
[12] Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

41.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[13]

42.    The most effective weapon against sexual exploitation and human trafficking is education and training.[14]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[15]

43.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[16]   In reference to companies like the

---

[13]https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

[14] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[15] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[16] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

10

Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

44.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

45.    Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

46.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (H.E.W.)'s trafficking, that sex trafficking was ongoing and widespread at the Defendant's hotel(s).

47.    Unfortunately for Jane Doe (H.E.W.), Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (H.E.W.).

**III.    The TVPRA violations at the Country Inn & Suites.**

48.    Between September 2013 and November 2013, Jane Doe (H.E.W.) was repeatedly trafficked at the Country Inn & Suites. The Country Inn Franchisee Defendants and the Country

Inn Brand Defendants (collectively "Country Inn Defendants") benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The Country Inn Defendants knew or should have known they were facilitating sex trafficking at the Country Inn & Suites Austin, including the trafficking of Jane Doe (H.E.W.).

**The Country Inn Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

49.    The Country Inn Defendants facilitated widespread sex trafficking at the Country Inn & Suites, Austin, including the trafficking of Jane Doe (H.E.W.).

> *1) The Country Inn Franchisee Defendants facilitated sex trafficking at the Country Inn & Suites Austin.*

50.    The Country Inn Franchisee Defendants were responsible for the acts, omissions, and knowledge of all employees of the Country Inn & Suites, Austin  when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

51.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Country Inn & Suites, Austin, the Country Inn Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

52.    The Country Inn Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

12

53.     The Country Inn Franchisee Defendants also facilitated widespread trafficking at the Country Inn & Suites, Austin, including the trafficking of Jane Doe (H.E.W.), in ways including:

   a. following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

   b. choosing not to report known or suspected criminal activity, including sex trafficking, to law enforcement;

   c. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

54.     Through these actions, the Country Inn Franchisee Defendants formed an implicit agreement with traffickers and encouraged them to return to the Country Inn & Suites, Austin to exploit victims including Jane Doe (H.E.W.).

   2)  *The Country Inn Brand Defendants facilitated sex trafficking at the Country Inn & Suites, Austin*

55.     On information and belief, the Country Inn Brand Defendants directly participated in renting rooms to traffickers at the Country Inn & Suites, Austin, including to Jane Doe (H.E.W.)'s traffickers, in ways including, but not limited to, the following:

   a. The Country Inn Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods hotel staff used for each of these processes.

   b. The Country Inn Brand Defendants directly made reservations for rooms at the Country Inn & Suites, Austin and accepted payment for those rooms through a central reservation system that it controlled and operated, and which franchisee was required to use. The Country Inn Brand Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement.

   c. The Country Inn Brand Defendants controlled extension of existing room reservations and guests had to contact the Country Inn Brand Defendants to extend reservations.

13

d.  The Country Inn Brand Defendants controlled the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems they required franchisee to use.

e.  The Country Inn Brand Defendants controlled policies and protocols for guest identity verification at the time of check in.

f.  The Country Inn Brand Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

g.  The Country Inn Brand Defendants controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

h.  The Country Inn Brand Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Country Inn & Suites, Austin until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i.  The Country Inn Brand Defendants required franchisee to use their property management system, which was owned, maintained, controlled, and operated by the Country Inn Brand Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

56.  Despite having active and constructive knowledge of the widespread sex trafficking at the Country Inn & Suites, Austin, the Country Inn Brand Defendants continued renting rooms to traffickers, including the trafficker of Jane Doe (H.E.W.).

57.  Upon information and belief, the Country Inn Brand Defendants participated directly in aspects of the operation of the Country Inn & Suites, Austin that influenced whether and to what extent trafficking occurred at the hotel, including, but not limited to, the following:

a.  The Country Inn Brand Defendants retained control over and responsibility for training related to detecting and responding to human trafficking at the Country Inn & Suites, Austin. The Country Inn Brand Defendants retained controlled over whether training was provided, when it was provided, who provided it, how it was provided, the content of the training, and how effectiveness of the training was assessed.

b.  The Country Inn Brand Defendants retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking at the Country Inn & Suites, Austin.

14

c.  The Country Inn Brand Defendants retained control over use of brand-wide data analytics to assess and address human trafficking Embassy Suites hotels.

d.  The Country Inn Brand Defendants assumed the responsibility to identify geographic locations and specific hotel properties that had a heightened risk of human trafficking and to enact appropriate measures to respond to properties with higher risk.

e.  The Country Inn Brand Defendants assumed the responsibility to alert specific hotels, including the Country Inn & Suites, Austin, of circumstances, prompting a high risk for trafficking activity.

f.  The Country Inn Brand Defendants assumed responsibility for guest safety by collecting and maintaining and images or footage from closed circuit television (CCTV) at hotel properties[17]

g.  The Country Inn Brand Defendants maintained control over all details of the terms under which franchised hotels, including the Country Inn & Suites, Austin, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Country Inn Brand Defendants controlled whether certain sites known to be frequently used to advertise victims for trafficking would be blocked from the hotel's network.

h.  The Country Inn Brand Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Country Inn & Suites, Austin, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

i.  The Country Inn Brand Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Country Inn & Suites, Austin including trends that would reveal patterns consistent with human trafficking.

58.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Country Inn & Suites, Austin, the Country Inn Brand Defendants continued participating in a venture at that hotel, with their franchisee and the hotel staff, in a way that the Country Inn Brand Defendants knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

---

[17] https://www.hilton.com/en/p/global-privacy-statement/#CollectionGenerally

15

a.  While the Country Inn Brand Defendants publicly committed to the EPCAT Code in 2011, they unreasonably delayed and failed to take any significant steps to implement that commitment for several years.[18]

b.  The Country Inn Brand Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

c.  The Country Inn Brand Defendants implicitly condoned and endorsing its franchisee's repeated decisions not to report or respond to trafficking appropriately.

d.  The Country Inn Brand Defendants ignored policies that they had purportedly enacted and implemented.

e.  The Country Inn Brand Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Country Inn & Suites, Austin.

f.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Country Inn & Suites, Austin, the Country Inn Brand Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at Country Inn Branded properties.

g.  The Country Inn Brand Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

h.  The Country Inn Brand Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

i.  The Country Inn Brand Defendants adopted and required franchisee to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

j.  The Country Inn Brand Defendants continued to allow the Country Inn & Suites, Austin to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy of the Country Inn Brand affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

---

[18] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2012; https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

59.     If the Country Inn Brand Defendants had exercised reasonable diligence when operating the Country Inn & Suites, Austin and in the areas over which they retained control, then the Country Inn Brand Defendants would have prevented the Country Inn & Suites, Austin from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the Country Inn Brand Defendants engaged conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

### A.  The Country Inn Defendants' ventures at the Country Inn & Suites, Austin

60.     Through the conduct described above, the Country Inn Franchisee Defendants and the Country Inn Brand Defendants knowingly benefited from engaging in a venture with sex traffickers at the Country Inn & Suites, Austin, including Jane Doe (H.E.W.)'s trafficker, as follows:

   a. The Country Inn Franchisee Defendants and the Country Inn Brand Defendants both received benefits, including increased revenue, every time a room was rented at the Country Inn & Suites, Austin.

   b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Country Inn & Suites, Austin, which the Country Inn Franchisee Defendants and the Country Inn Brand Defendants knew or should have known about.

   c. The Country Inn Franchisee Defendants and the Country Inn Brand Defendants associated with traffickers, including Jane Doe (H.E.W.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

   d. The Country Inn Franchisee Defendants and the Country Inn Brand Defendants had a mutually beneficial relationship with the traffickers at the Country Inn & Suites, Austin, fueled by sexual exploitation of victims, including Jane Doe (H.E.W.).

   e. Sex traffickers, including Jane Doe (H.E.W.)'s traffickers, frequently used the Country Inn & Suites, Austin for their trafficking because of an implicit understanding that the Country Inn & Suites, Austin was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the Country

Inn Franchisee Defendants and the Country Inn Brand Defendants facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for the Country Inn Franchisee Defendants and the Country Inn Brand Defendants.

f.  Both the Country Inn Franchisee Defendants and the Country Inn Brand Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  Jane Doe (H.E.W.)'s trafficking at the Country Inn & Suites, Austin was a result of the Country Inn Franchisee Defendants and the Country Inn Brand Defendants' participation in a venture with criminal traffickers. If the Country Inn Franchisee Defendants and the Country Inn Brand Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at the Country Inn & Suites, Austin.

61.    Through the conduct described above, the Country Inn Brand Defendants also knowingly benefited from engaging in a commercial venture with the Country Inn Franchisee Defendants operating the Country Inn & Suites, Austin as follows:

a.  The Country Inn Brand Defendants associated with the Country Inn Franchisee Defendants to operate the Country Inn & Suites, Austin.

b.  Pursuant to the terms of the franchising agreement, both the Country Inn Franchisee Defendants and the Country Inn Brand Defendants received financial benefits from operating the Country Inn & Suites, Austin, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  By participating in a venture that facilitated sex trafficking, also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Country Inn & Suites, Austin specifically.

d.  This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the Country Inn Franchisee Defendants and the widespread sex trafficking at the Country Inn & Suites, Austin.

e.  Despite their actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Country Inn Brand Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Country Inn & Suites, Austin in a way that they knew or should have

18

known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (H.E.W.).

f. Jane Doe (H.E.W.)'s trafficking at the Country Inn & Suites, Austin was a result the Country Inn Franchisee Defendants and the Country Inn Brand Defendants facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Country Inn & Suites, Austin. Had the Country Inn Franchisee Defendants and the Country Inn Brand Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at the Country Inn & Suites, Austin.

**B. The Country Inn Franchisee Defendants and staff at the Country Inn & Suites, Austin acted as actual agents of the Country Inn Brand Defendants.**

1. The Country Inn Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Days Inn Franchisee Defendants and staff at Country Inn & Suites, which are the Country Inn Brand Defendants' actual agents or subagents.

2. The Country Inn Brand Defendants subjected Country Inn and Suites Franchisee Defendants to detailed standards and requirements regarding the operation of Country Inn and Suites through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Country Inn Brand Defendants. These written standards, protocols, and requirements:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Country Inn Franchisee Defendants used at Country Inn & Suites; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c. dictated the specific manner in which Country Inn Franchisee Defendants and hotel staff must carry out most day-to-day functions at Country Inn; and

d. significantly exceeded what was necessary for the Country Inn Brand Defendants to protect their registered trademarks.

19

3.     The Country Inn Brand Defendants obscured the full extent of control it exercises over franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.

4.     In addition to the ways described above, upon information and belief, the Country Inn Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Country Inn Franchisee Defendants' day-to-day operation of the Country Inn and Suites, including the following ways:

a.  The Country Inn Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Country Inn Brand Defendants to protect their registered trademarks;

b.  The Country Inn Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. The Country Inn Brand Defendants provided training for hotel management and select hotel staff on-site at the Country Inn and at locations selected by the Country Inn Brand Defendants;

c.  The Country Inn Brand Defendants provided hotels staff with training it created through an online learning platform, Country Inn University, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  The Country Inn Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  The Country Inn Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  The Country Inn Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  The Country Inn Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisee was required to purchase to operate the Country Inn, the Country Inn Brand Defendants designated approved vendors and

20

prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i.  The Country Inn Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j.  The Country Inn Brand Defendants set required staffing levels for the Country Inn;

k.  The Country Inn Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  The Country Inn Brand Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  The Country Inn Brand Defendants provided benefits for employees of franchised hotels;

n.  The Country Inn Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the Country Inn and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Country Inn retained the right to provide refunds or other compensation to guests and to require Country Inn Franchisee Defendants to pay associated costs;

o.  The Country Inn Brand Defendants generated reports and analysis of guest complaints and online reviews for the Country Inn;

p.  The Country Inn Brand Defendants set detailed requirements for insurance that Country Inn Franchisee Defendants must purchase;

q.  The Country Inn Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r.  The Country Inn Brand Defendants regularly audited the books and records of Country Inn Franchisee Defendants;

s.  The Country Inn Brand Defendants conducted frequent and unscheduled inspections of the Country Inn;

t.  The Country Inn Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of the Country Inn Brand Defendants' detailed rules,

21

expectations, protocols, or policies, including those that governed day-to-day operations of the Country Inn;

u. The Country Inn Brand Defendants controlled all marketing for the Country Inn & Suites, directly provided marketing services, and prohibited Country Inn Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by Country Inn;

v. The Country Inn Brand Defendants exercised or retained control over all aspects of building and facility design;

w. The Country Inn Brand Defendants imposed detailed recordkeeping and reporting requirements on Country Inn Franchisee Defendants regarding virtually all aspects of hotel operations;

x. The Country Inn Brand Defendants supervised and controlled day-to-day operations of the Country Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Country Inn Franchisee Defendants to use;

y. The Country Inn Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. The Country Inn Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

5. Upon information and belief, the Country Inn Brand Defendants had the right to and did enforce its control over Country Inn Franchisee Defendants through various methods, including:

a. the right to conduct detailed inspections of the Country Inn;

b. monitoring or auditing the Country Inn Franchisee Defendants for compliance with policies and expectations;

c. directing Country Inn Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f.   the right to impose fines or penalties;

g.   the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

### C.  The Americas Best Defendants Knowledge of Sex Trafficking

62.     The Americas Best Defendants have known, since well before Jane Doe (H.E.W.)'s trafficking, that there was widespread sex trafficking at the Americas Best Value Inn.

63.     Sex trafficking was prevalent at the Americas Best Value Inn and occurred in a way that was obvious and apparent.

64.     Public information, including online reviews, confirms both the widespread sex trafficking problem at the Americas Best Value Inn and the Americas Best Defendants' knowledge of this sex trafficking. Upon information and belief, the Americas Best Defendants monitored online reviews for indicia of criminal activity, including sex trafficking.

65.     Traffickers, including the trafficker of Jane Doe (H.E.W.), repeatedly returned to the Americas Best Value Inn because the hotel provided a favorable environment for trafficking due to policies and procedures adopted and implemented by the Americas Best Defendants and because the hotel staff turned a blind eye to obvious signs of trafficking.

66.     There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Americas Best Defendants knew or should have known about.

67.     The Americas Best Defendants, acting individually and jointly, directly participated in operation of the Americas Best Value Inn and, therefore, directly monitored and supervised activity at the hotel.

68.    The Americas Best Defendants are all affiliated entities subject to common control and that jointly operated the Americas Best Value Inn and shared revenue and profit from operation of the hotel.

69.    All knowledge from the hotel staff at is imputed to the Americas Best Defendants who jointly employ and/or control the hotel staff. The Americas Best Defendants knew about this widespread and ongoing trafficking at the Americas Best Value Inn, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

70.    Upon information and belief, in addition to public source of information about trafficking, the Americas Best Defendants knew or should have known about the widespread trafficking at the Americas Best Value Inn based on non-public sources of information including but not limited to:

    a.  direct observation of hotel staff and management;

    b.  surveillance of the property;

    c.  customer complaints;

    d.  monitoring of online reviews and other customer feedback;

    e.  information received from law enforcement; and

    f.  other sources of non-public information available to the Hotel Pennsylvania Defendants.

71.    The Americas Best Defendants had constructive knowledge of the widespread and ongoing trafficking at the Americas Best Value Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

24

72.     During the period that Jane Doe (H.E.W.) was trafficked at Americas Best Value Inn, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

a.  The rooms at this hotel would be booked in the name of one of the johns or another victim who was being trafficked at this hotel at the same time.

b.  Jane Doe (H.E.W.)'s trafficker was trafficking other victims at this hotel at or around the same time Jane Doe (H.E.W.) was being trafficked there.

c.  The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

d.  Jane Doe (H.E.W.)'s trafficker would not allow housekeeping to enter the room where Jane Doe (H.E.W.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

e.  The trafficker was often present with Jane Doe (H.E.W.) at check in and would linger around the hotel or in the parking lot while she was with a john.

f.  Jane Doe (H.E.W.)'s trafficker beat her in the rooms of this hotel, causing her to suffer visible injuries.

g.  Jane Doe (H.E.W.)'s demeanor reflected her fear of her trafficker and the control he was exercising over her.

h.  There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men who were not hotel guests.

i.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

73.     Based upon information and belief, multiple employees at the Americas Best Value Inn, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

74.    Based on this and on the other methods, listed above, that they used to monitor and supervise the Americas Best Value Inn, the Americas Best Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the Americas Best Value Inn.

75.    Given these obvious signs, the Americas Best Defendants knew or should have known about the trafficking of Jane Doe (H.E.W.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

76.    The Americas Best Defendants also knew or should have known about Jane Doe (H.E.W.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Americas Best Value Inn.

77.    The Americas Best Defendants had constructive knowledge of the trafficking of Jane Doe (H.E.W.) at the Americas Best Value Inn because her trafficking was the direct result of their facilitation of trafficking at that hotel.

### D. The Americas Best Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)

78.    The Americas Best Defendants facilitated widespread sex trafficking at the Americas Best Value Inn, including the trafficking of Jane Doe (H.E.W.).

79.    The Americas Best Defendants were responsible for the acts, omissions, and knowledge of all employees of the Americas Best Value Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

80.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Americas Best Value Inn, the Americas Best Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

81.     The Americas Best Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

82.     The Americas Best Defendants also facilitated widespread trafficking at the Americas Best Value Inn, including the trafficking of Jane Doe (H.E.W.), in ways including:

a.  following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

b.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable policies and procedures;

c.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

d.  continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Americas Best Value Inn.

e.  despite having specific knowledge of policies that would significantly reduce sex trafficking at the Americas Best Value Inn, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Hotel Pennsylvania.

f.  allowing traffickers to reserve rooms using cash or prepaid cards, which provided relative anonymity and non-traceability.

g.  adopting check in procedures that failed to ensure all hotel guests and visitors were appropriately identified and, instead, allowing traffickers and johns to use the hotel with minimal risk of traceability.

83. If the Americas Best Defendants had exercised reasonable diligence when operating the Americas Best Value Inn, then the Americas Best Defendants would have prevented the Americas Best Value Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the Americas Best Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

## IV.   The TVPRA violations at the Baymont Inn & Suites.

84. Jane Doe (H.E.W.) was trafficked at the Baymont Inn & Suites, which one of the primary locations used by her trafficker, many times. The period during which Jane Doe (H.E.W.) was trafficked at this hotel includes but is not limited to repeated incidents of trafficking in 2013. The Baymont Defendants each benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The Baymont Defendants knew or should have known they were facilitating sex trafficking at Baymont, including the trafficking of Jane Doe (H.E.W.).

### A.   The Baymont Defendants' Knowledge of Sex Trafficking

85. The Baymont Defendants have known, since well before Jane Doe (H.E.W.)'s trafficking, that there was widespread sex trafficking at the Baymont Inn & Suites.

86. Sex trafficking was prevalent at the Baymont Inn & Suites and occurred in a way that was obvious and apparent.

87. The Baymont Inn & Suites was located in an area known to be at high risk for human trafficking activity.

88. Public information, including online reviews and news articles, confirms both the widespread sex trafficking problem at the Baymont Inn & Suites and the Baymont Defendants'

knowledge of this sex trafficking. Upon information and belief, the Baymont Defendants monitored online reviews and news reports for indicia of criminal activity, including sex trafficking.

89.     Traffickers, including the trafficker of Jane Doe (H.E.W.) repeatedly returned to the Baymont Inn & Suites because the hotel provided a favorable environment for trafficking due to policies and procedures of the Baymont Defendants and because the hotel staff turned a blind eye to obvious signs of trafficking.

90.     Staff of the Baymont Inn & Suites, including management-level staff, had a familiar relationship with Jane Doe (H.E.W.)'s trafficker who used the Baymont Inn & Suites to traffic multiple victims. The staff, including management-level staff, would tip the trafficker off if law enforcement showed up at the Baymont Inn & Suites.

91.     There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Baymont Defendants knew or should have known about.

92.     The Baymont Defendants, acting individually and jointly, directly participated in operation and management of the Baymont and thus directly monitored and supervised activity at the hotel.

93.     All knowledge from the hotel staff at is imputed to the Baymont Defendants who jointly employed and/or controlled the hotel staff. The Baymont Defendants knew about this widespread and ongoing trafficking at the Baymont Inn & Suites, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

94.     Upon information and belief, in addition to available public source of information about trafficking, the Baymont Defendants knew or should have known about the widespread trafficking at the Baymont based on non-public sources of information including but not limited to:

    a.  direct observation of hotel staff and management;

    b.  surveillance of the property;

    c.  customer complaints;

    d.  monitoring of online reviews and other customer feedback;

    e.  information received from law enforcement; and

    f.  other sources of non-public information available to the Baymont Defendants.

95.     The Baymont Defendants had constructive knowledge of the widespread and ongoing trafficking at the Baymont Inn & Suites because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

96.     During the period that Jane Doe (H.E.W.) was trafficked at Baymont Inn & Suites, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking, including:

    a.  Jane Doe (H.E.W.)'s trafficker would book rooms, often using the name of Jane Doe (H.E.W.) or another sex trafficking victim who was frequently trafficked at this same hotel.

    b.  The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

    c.  Other women were being trafficked at the Baymont Inn & Suites at the same time as Jane Doe (H.E.W.).

    d.  Jane Doe (H.E.W.)'s trafficker would not allow housekeeping to enter the room where Jane Doe (H.E.W.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

e. The trafficker was often present with Jane Doe (H.E.W.) at check in and would linger around the hotel or in the parking lot while she was with a john.

f. Jane Doe (H.E.W.)'s demeanor reflected her fear of her trafficker and the control he was exercising over her.

g. There were obvious signs that Jane Doe (H.E.W.)'s trafficker kept her under the influence of drugs while at this hotel.

h. There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men who were not hotel guests. Between 10 and 15 men would come out of her room each day.

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

97. Based upon information and belief, multiple employees at the Baymont Inn & Suites, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

98. Based on this and on the other methods, listed above, that they used to monitor and supervise the hotel, the Baymont Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the Baymont Inn & Suites.

99. It is apparent that hotel staff, including management-level staff, knew about the activities of Jane (H.E.W.)'s trafficker because they developed a relationship with the trafficker and alerted him when law enforcement was coming to the hotel.

100. Given these obvious signs, the Baymont Defendants knew or should have known about the trafficking of Jane Doe (H.E.W.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

101. The Baymont Defendants had constructive knowledge of the trafficking of Jane Doe (H.E.W.) at the Baymont Inn & Suites because her trafficking was the direct result of their facilitation of trafficking at that hotel.

31

**B. The Baymont Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

102.    The Baymont Defendants facilitated widespread sex trafficking at the Baymont, including the trafficking of Jane Doe (H.E.W.).

103.    The Baymont Defendants were responsible for the acts, omissions, and knowledge of all employees of the Baymont Inn & Suites when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

104.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Baymont Inn & Suites, the Baymont Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit Jane Doe (H.E.W.).

105.    The Baymont Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

106.    The Baymont Defendants also facilitated widespread trafficking at the Baymont Inn & Suites, including the trafficking of Jane Doe (H.E.W.), in ways including:

    a. forming relationships with traffickers and alerting them when law enforcement arrived at the hotel;

    b. following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

    c. choosing not to report known or suspected criminal activity to law enforcement;

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

e. continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Baymont Inn & Suites.

f. despite having specific knowledge of policies that would significantly reduce sex trafficking at the Baymont Inn & Suites, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Baymont Inn & Suites.

g. allowing traffickers to reserve rooms using cash or prepaid cards, which provided relative anonymity and non-traceability.

h. adopting check in procedures that failed to ensure all hotel guests and visitors were appropriately identified and, instead, allowing traffickers and johns to use the hotel with minimal risk of traceability.

107. If the Baymont Defendants had exercised reasonable diligence when operating the Baymont, then the Baymont Defendants would have prevented the Baymont Inn & Suites from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the Baymont Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

## V. The TVPRA violations at the Days Inn.

108. Jane Doe (H.E.W.) was trafficked at the Days Inn, which one of the primary locations used by her trafficker, many times. The period during which Jane Doe (H.E.W.) was trafficked at this hotel includes but is not limited to repeated incidents of trafficking in 2013 and 2014. The Days Inn Defendants each benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The Days Inn Defendants knew or should have known they were facilitating sex trafficking at Days Inn, including the trafficking of Jane Doe (H.E.W.).

33

### A. The Days Inn Defendants' Knowledge of Sex Trafficking

109.    The Days Inn Defendants have known, since well before Jane Doe (H.E.W.)'s trafficking, that there was widespread sex trafficking at the Days Inn.

110.    Sex trafficking was prevalent at the Days Inn and occurred in a way that was obvious and apparent.

111.    The Days Inn was located in an area known to be at high risk for human trafficking activity.

112.    Public information, including online reviews and news articles, confirms both the widespread sex trafficking problem at the Days Inn and the Days Inn Defendants' knowledge of this sex trafficking. Upon information and belief, the Days Inn Defendants monitored online reviews and news reports for indicia of criminal activity, including sex trafficking.

113.    Traffickers, including the trafficker of Jane Doe (H.E.W.) repeatedly returned to the Days Inn because the hotel provided a favorable environment for trafficking due to policies and procedures of the Days Inn Defendants and because the hotel staff turned a blind eye to obvious signs of trafficking.

114.    Staff of the Days Inn, including management-level staff, had a familiar relationship with Jane Doe (H.E.W.)'s trafficker who used the Days Inn to traffic multiple victims. The staff, including management-level staff, would tip the trafficker off if law enforcement showed up at the Days Inn.

115.    There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Days Inn Defendants knew or should have known about.

116.    The Days Inn Defendants, acting individually and jointly, directly participated in operation and management of the Days Inn and thus directly monitored and supervised activity at the hotel.

117.    All knowledge from the hotel staff at is imputed to the Days Inn Defendants who jointly employed and/or controlled the hotel staff. The Days Inn Defendants knew about this widespread and ongoing trafficking at the Days Inn, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

118.    Upon information and belief, in addition to available public source of information about trafficking, the Days Inn Defendants knew or should have known about the widespread trafficking at the Days Inn based on non-public sources of information including but not limited to:

      a.   direct observation of hotel staff and management;

      b.   surveillance of the property;

      c.   customer complaints;

      d.   monitoring of online reviews and other customer feedback;

      e.   information received from law enforcement; and

      f.   other sources of non-public information available to the Days Inn Defendants.

119.    The Days Inn Defendants had constructive knowledge of the widespread and ongoing trafficking at the Days Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

120.    During the period that Jane Doe (H.E.W.) was trafficked at Days Inn, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking, including:

35

a. Jane Doe (H.E.W.)'s trafficker would book rooms, often using the name of Jane Doe (H.E.W.) or another sex trafficking victim who was frequently trafficked at this same hotel.

b. The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

c. Other women were being trafficked at the Days Inn at the same time as Jane Doe (H.E.W.).

d. Jane Doe (H.E.W.)'s trafficker would not allow housekeeping to enter the room where Jane Doe (H.E.W.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

e. The trafficker was often present with Jane Doe (H.E.W.) at check in and would linger around the hotel or in the parking lot while she was with a john.

f. Jane Doe (H.E.W.)'s demeanor reflected her fear of her trafficker and the control he was exercising over her.

g. There were obvious signs that Jane Doe (H.E.W.)'s trafficker kept her under the influence of drugs while at this hotel.

h. There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men who were not hotel guests. Between 10 and 15 men would come out of her room each day.

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

121. Based upon information and belief, multiple employees at the Days Inn, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

122. Based on this and on the other methods, listed above, that they used to monitor and supervise the hotel, the Days Inn Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the Days Inn.

36

123. It is apparent that hotel staff, including management-level staff, knew about the activities of Jane (H.E.W.)'s trafficker because they developed a relationship with the trafficker and alerted him when law enforcement was coming to the hotel.

124. Given these obvious signs, the Days Inn Defendants knew or should have known about the trafficking of Jane Doe (H.E.W.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

125. The Days Inn Defendants had constructive knowledge of the trafficking of Jane Doe (H.E.W.) at the Days Inn because her trafficking was the direct result of their facilitation of trafficking at that hotel.

**B. The Days Inn Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

126. The Days Inn Defendants facilitated widespread sex trafficking at the Days Inn, including the trafficking of Jane Doe (H.E.W.).

127. The Days Inn Defendants were responsible for the acts, omissions, and knowledge of all employees of the Days Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

128. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn, the Days Inn Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit Jane Doe (H.E.W.).

129. The Days Inn Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her

trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

130. The Days Inn Defendants also facilitated widespread trafficking at the Days Inn, including the trafficking of Jane Doe (H.E.W.), in ways including:

    i. forming relationships with traffickers and alerting them when law enforcement arrived at the hotel;

    j. following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

    k. choosing not to report known or suspected criminal activity to law enforcement;

    l. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

    m. continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Days Inn.

    n. despite having specific knowledge of policies that would significantly reduce sex trafficking at the Days Inn, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Days Inn.

    o. allowing traffickers to reserve rooms using cash or prepaid cards, which provided relative anonymity and non-traceability.

    p. adopting check in procedures that failed to ensure all hotel guests and visitors were appropriately identified and, instead, allowing traffickers and johns to use the hotel with minimal risk of traceability.

131. If the Days Inn Defendants had exercised reasonable diligence when operating the Days Inn, then the Days Inn Defendants would have prevented the Days Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the Days Inn Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

132.   Jane Doe (H.E.W.) incorporates all other allegations.

**I.   Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

133.   Jane Doe (H.E.W.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

134.   All Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because each of these Defendants:

    a.   violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (H.E.W.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

    b.   violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

135.   Violations of 18 U.S.C §1595(a) by each of these Defendants as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (H.E.W.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.   Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA**

136.   Jane Doe (H.E.W.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that

the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

137. Through acts and omissions described throughout this Complaint, each of the Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (H.E.W.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (H.E.W.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each Defendant is liable as a beneficiary under 18 U.S.C §1595(a).

138. Through the acts and omissions described throughout this Complaint, each Defendant received a financial benefit from participating in a venture with other Defendants operating its respective hotel property despite the fact that each Defendant knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

139. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (H.E.W.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## III. Cause of Action 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants)

140. Each of the Franchisee Defendants acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property.

141. Each of the Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

142.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

143.    Each of the Franchisor Defendants is vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

144.    As alleged above, Country Inn Brand Defendants are directly liable to Jane Doe (H.E.W.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). The Country Inn Brand Defendants are also directly liable to Jane Doe (H.E.W.) under § 2255. The Country Inn Brand Defendants are vicariously liable to Jane Doe (H.E.W.) for those same violations.

145.    Each of the Country Inn Brand Defendants is liable for the acts and omissions of each of the other Country Inn Brand Defendants with respect to the operation and franchising of the Country Inn & Suites. On information and belief, the Country Inn Brand Defendants, who were corporate affiliates subject to common ownership and control, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Country Inn & Suites. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Country Inn & Suites.

IV.    **Cause of Action 4: Franchisor's Vicarious Liability for Franchisee's Violations of the TVPRA as Joint Employer of the Staff at the subject Country Inn & Suites**

146.    At all relevant times, the Country Inn Brand Defendants were joint employers of the staff of the Country Inn & Suites because they exercised joint control over the terms and conditions of employment, and economic realities reflect joint employment.

147.    Under the TVPRA and the federal common law, the Country Inn Brand Defendants, as a joint employer of the staff of the subject Country Inn & Suites, are vicariously liable for the acts and omissions of the staff of the subject Country Inn & Suites.

148.    As alleged above, the staff of the subject Country Inn & Suites engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). The Country Inn Brand Defendants are vicariously liable for these TVPRA violations.

## DAMAGES

149.    The Defendants' acts and omissions, individually and collectively, caused JANE DOE (H.E.W.) to sustain legal damages.

150.    Defendants are joint and severally liable for all past and future damages sustained by JANE DOE (H.E.W.).

151.    JANE DOE (H.E.W.) is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages (until trial and in the future)

    b.  Direct damages (until trial and in the future)

    c.  Incidental and consequential damages (until trial and in the future)

    d.  Mental anguish and emotional distress damages (until trial and in the future)

    e.  Lost earnings and lost earning capacity (until trial and in the future)

    f.  Necessary medical expenses (until trial and in the future)

    g.  Life care expenses (until trial and in the future)

    h.  Physical pain and suffering (until trial and in the future)

    i.  Physical impairment (until trial and in the future)

    j.  Unjust enrichment (until trial and in the future)

k. Exemplary/Punitive damages.

l. Attorneys' fees

m. Costs of this action

n. Pre-judgment and all other interest recoverable

## JURY TRIAL

152.    JANE DOE (H.E.W.) demands a jury trial on all issues.

## RELIEF SOUGHT

153.    WHEREFORE, JANE DOE (H.E.W.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for JANE DOE (H.E.W.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which JANE DOE (H.E.W.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**PROVOST UMPHREY LAW FIRM, LLC**

By:    */s/ Colin D. Moore*
Colin D. Moore | SBN 24041513
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
cmoore@pulf.com

**ATTORNEYS FOR PLAINTIFF**

43